UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STEVEN C. CELANI,                  :
          Plaintiff,               :
                                   :
          v.                       :      CA 07-429 ML
                                   :
MICHAEL J. ASTRUE,                 :
Commissioner,                      :
Social Security Administration,    :
          Defendant.               :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This matter is before the Court on the request of Plaintiff Steven C. Celani ("Plaintiff") for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), under §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act").  Plaintiff has filed a motion to reverse the Commissioner's decision.  Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.

The matter has been referred to this Magistrate Judge for preliminary review, findings, and recommended disposition.  See 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record.  Accordingly, based on the following analysis, I recommend that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Document ("Doc.") #8) ("Motion to Affirm") be granted and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. #7) ("Motion to Reverse") be denied.

### Facts and Travel

Plaintiff was born in 1964, (Record ("R.") at 19, 55), and he was forty-two years old at the time of the hearing before the Administrative Law Judge ("ALJ"), (R. at 149).  He has past relevant work as a painter in the auto body business.  (R. at 14, 48-49, 55, 175)

On December 21, 2004, Plaintiff protectively filed applications for DIB and SSI, alleging disability since June 3, 2003, due to asthma and/or lung disease.[1]  (R. at 12, 65)  The applications were denied initially and on reconsideration, (R. at 12, 28, 29), and a timely request for a hearing by an ALJ was filed, (R. at 12, 38).  Plaintiff appeared with counsel and testified at a hearing held on March 1, 2007.  (R. at 149-82)  Also testifying at the hearing were a medical expert ("ME"), (R. at 154-55, 173), and a vocational expert ("VE"), (R. at 176-82).  In a March 9, 2007, decision the ALJ found that Plaintiff was not disabled within the meaning of the Act and, therefore, not entitled to a period of DIB or SSI.  (R. at 12-21)  Plaintiff requested review by the Appeals Council, (R. at 8), which on September 21, 2007, denied his request, (R. at 4-6), thereby rendering the ALJ's opinion the final decision of the Commissioner, (R. at 4).  Thereafter, Plaintiff filed this action for judicial review.

### Issue

The issue for determination is whether substantial evidence supports the Commissioner's decision that Plaintiff is not disabled within the meaning of the Act.

---

[1] Plaintiff's applications for DIB and SSI are not in the record. (R. at 152)  The Court infers that asthma or lung disease was the basis for Plaintiff's claimed disability from other documents in the record.  (R. at 14, 65)

## Standard of Review

The Court's role in reviewing the Commissioner's decision is limited. Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999). Although questions of law are reviewed *de novo*, the Commissioner's findings of fact, if supported by substantial evidence in the record,[2] are conclusive. Id. (citing 42 U.S.C. § 405(g)). The determination of substantiality is based upon an evaluation of the record as a whole. Id. (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)). The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426 (1971))).

## Law

To qualify for DIB, a claimant must meet certain insured status requirements, be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act. See 42 U.S.C. § 423(a). An individual is eligible to

---

[2] The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)); see also Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v. Perales).

receive SSI if he is aged, blind, or disabled and meets certain income requirements.  See 42 U.S.C. § 1382(a).

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...."  42 U.S.C. 423(d)(1)(A).  A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[3]  20 C.F.R. §§ 404.1521(a), 416.921(a) (2008).[4]  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21

---

[3] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b) (2007).  Examples of these include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

Id.

[4] The Social Security Administration ("SSA") has promulgated identical sets of regulations governing eligibility for DIB and Supplemental Security Income "SSI").  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, the Court hereafter will cite only to one set of regulations.  See id.

(1st Cir. 1986); 20 C.F.R. § 404.1528(a) (2008)("Your statements alone are not enough to establish that there is a physical or mental impairment.").

   The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a) (2008); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether he is able to perform his past relevant work; and (5) whether he remains capable of performing any work within the economy.  See 20 C.F.R. § 404.1520(b)-(g).  The evaluation may be terminated at any step.  See Seavey, 276 F.3d at 4.  "The applicant has the burden of production and proof at the first four steps of the process.  If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

**ALJ's Decision**

   Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff met the disability insured status requirements through December 31, 2008, (R. at 14); that Plaintiff had not engaged in substantial gainful activity since June 3, 2003, (id.); that Plaintiff's asthma constituted a severe impairment which significantly affected his ability to engage in basic work-related activities, (id.); that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in

20 C.F.R. Part 404, Subpart P, Appendix 1, 404.1525, 404.1526,
(R. at 16); that Plaintiff retained the residual functional
capacity ("RFC") to perform medium work which required lifting
and/or carrying 50 pounds occasionally and 25 pounds frequently,
standing and/or walking for six hours in an eight hour workday,
sitting for six hours in an eight hour workday, but which did not
involve concentrated exposure to pulmonary irritants,
occupational hazards, or extremes of temperatures, (id.); that
Plaintiff's statements regarding the intensity, persistence, and
limiting effects of his symptoms were not entirely credible, (R.
at 18); that Plaintiff was unable to perform his past relevant
work as a painter, (R. at 19); that, given Plaintiff's age,
education, work experience, and RFC, there were jobs that existed
in significant numbers in the national economy which Plaintiff
was capable of performing, (id.); and that, therefore, Plaintiff
had not been under a disability, as defined in the Act, at any
time from June 3, 2003, through the date of the ALJ's decision,
(R. at 20).

## Errors Claimed

Plaintiff alleges two errors by the ALJ.  First, Plaintiff
claims that the ALJ erred in finding Plaintiff limited with
regard to "concentrated exposure" to pulmonary irritants, rather
than all exposure.  See Plaintiff's Memorandum in Support of His
Motion to Reverse the Decision of the Commissioner ("Plaintiff's
Mem.") at 9-10.  Second, Plaintiff contends that the ALJ erred in
failing to find that Plaintiff had a severe mental impairment.
See id. at 10-12.

## Discussion

**I.  Substantial evidence supports the ALJ's determination that
Plaintiff's need to avoid exposure to pulmonary irritants does
not preclude him from returning to the workforce.**

The ALJ found that Plaintiff was not disabled because his

RFC allows him to return to the workforce in a different capacity.  (R. at 16, 19-20)  In reaching this decision, the ALJ relied largely on the testimony of the VE.  (R. at 20)

Plaintiff contends that the VE's testimony does not constitute substantial evidence to support the ALJ's step five determination because the hypothetical question which the ALJ posed to the VE allegedly suffered from a flawed premise.  See Plaintiff's Mem. at 9-10.  Specifically, Plaintiff complains that the ALJ stated that the hypothetical claimant needed to avoid only "concentrated exposure to pulmonary irritants," (R. at 176), instead of "all exposure," Plaintiff's Mem. at 9.  Plaintiff asserts that the use of the qualifier "concentrated" is not based on any medical evidence of record, that no doctor opined that this limitation was sufficient, and that it is contrary to the evidence of record.  Id.  The Court disagrees.

In asserting that there is no medical evidence to support the ALJ's use of the term "concentrated exposure," (R. at 176), Plaintiff either misreads or misconstrues the reports of two state agency physicians.  Both Joseph F. Callaghan, M.D. ("Dr. Callaghan"), and Alberto F. Tonelli, M.D. ("Dr. Tonelli"), found that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.[5]  (R. at 105, 108-09)  Thus, the ALJ's use of the term "concentrated" is supported by the opinion of these two physicians, making this case distinguishable from Iafrate v. Barnhart, 261 F.Supp.2d 96

---

[5] Plaintiff's misreading of the record may be due to the fact that the opinions of Drs. Callaghan and Tonelli that Plaintiff needed to "avoid concentrated exposure," (R. at 105), to fumes, odors, dusts, gases, poor ventilation, etc., appear on the same page of the record, (id.), and Thomas Bennett, M.D. ("Dr. Bennett"), subsequently indicated by drawing an arrow  that Plaintiff should "avoid all exposure," (id.).  If this sequence is not considered, one could erroneously conclude that all three doctors opined that Plaintiff needed to "avoid all exposure."

(D.R.I. 2003), which Plaintiff cites. <u>See</u> Plaintiff's Mem. at 10. In <u>Iafrate</u>, District Judge Smith found that the ALJ, in possessing a hypothetical question to the VE, "framed the [p]laintiff's limitation more narrowly than he should have, based upon the medical evidence in the record (using the word 'concentrated' in the hypothetical) causing the VE to conclude the number of jobs the [p]laintiff could perform was in the tens of thousands." <u>Iafrate v. Barnhart</u>, 261 F.Supp.2d at 99. However, the ALJ had determined that the plaintiff's RFC did not allow "'work in exposure to environmental pulmonary irritants ....'" <u>Iafrate v. Barnhart</u>, CA 01-561 S, Report and Recommendation of 1/23/03 at 18 (quoting ALJ's decision). The ALJ's use of the word "concentrated" in the hypothetical question in <u>Iafrate</u>, therefore, resulted in a hypothetical which assumed a less restricted functional limitation than the medical evidence permitted, <u>see</u> <u>Iafrate v. Barnhart</u>, 261 F.Supp.2d at 99 (citing <u>Rose v. Shalala</u>, 34 F.3d 13, 19 (1st Cir. 1994)("Because the ALJ's hypothetical assumed that fatigue did not pose a significant functional limitation for the claimant, and because the medical evidence did not permit that assumption, the ALJ could not rely on the vocational expert's response as a basis for finding claimant not disabled.")). Here, in contrast, the ALJ's hypothetical matched the functional limitations of Plaintiff's RFC, (R. at 16, 176), and the medical evidence (i.e., the opinions of Drs. Callaghan and Tonelli),(R. at 105). This permitted the assumption that, with respect to exposure to pulmonary irritants, the hypothetical claimant's functional limitation was limited as to "concentrated exposure to pulmonary irritants ...." (R. at 176) Thus, the ALJ could rely upon the VE's testimony for finding that Plaintiff was not disabled.

Plaintiff also cites <u>Arocho v. Secretary of Health & Human Services</u>, 670 F.2d 374 (1st Cir. 1982), as supportive of this

claim of error.  See Plaintiff's Mem. at 10.  In Arocho, the
First Circuit held that "in order for a vocational expert's
answer to a hypothetical question to be relevant, the inputs into
th[e] hypothetical must correspond to conclusions that are
supported by the outputs from the medical authorities."  Id. at
375.  Here, again in contrast to the situation which existed in
Iafrate, the ALJ's hypothetical accurately reflected Plaintiff's
RFC, and the limitation with respect to exposure to pulmonary
irritants is supported by outputs from the medical authorities.

It is true that one state agency physician, Thomas Bennett,
M.D. ("Dr. Bennett"), who reviewed the record at the
reconsideration level, opined that Plaintiff should avoid all
exposure to fumes, odors, dusts, gases, etc.  (R. at 105, 119)
However, there is nothing in the record to indicate that
Plaintiff's sensitivity to respiratory irritants worsened between
May 2005 when Drs. Callaghan and Tonelli reviewed the medical
evidence and November 2, 2005, when Dr. Bennett rendered his
opinion.  Dr. Bennett specifically stated that he had reviewed
all of the medical evidence and that he affirmed Dr. Tonelli's
assessment of May 27, 2005, "as written."  (R. at 108)  The
resolution of conflicts in the evidence is the ALJ's
responsibility, not the courts'.  Irlanda Ortiz v. Sec'y of
Health & Human Servs., 955 F.2d at 769 ("[T]he resolution of
conflicts in the evidence is for the [Commissioner], not for the
courts."); Evangelista v. Sec'y of Health & Human Servs., 826
F.2d 136, 141 (1st Cir. 1987)("Conflicts in the evidence are,
assuredly, for the [Commissioner]-rather than the courts-to
resolve.").  The ALJ was free, in the absence of additional
evidence undermining the validity of the opinions of Drs.
Callaghan and Tonelli, to utilize their assessments of the

environmental limitations applicable to Plaintiff.[6]

The Commissioner argues, and the Court agrees, that the ALJ's negative credibility assessment regarding the severity of Plaintiff's symptoms supports the use of the less restrictive "concentrated" rather than "all" limitation.[7]  It appears that all the DDS physicians, including Dr. Bennett, evaluated Plaintiff's symptoms as alleged.  The ALJ also had the benefit of later medical reports which were inconsistent with Plaintiff's testimony that he could only walk "a couple of blocks,"[8]  (R. at

---

[6] The ME did not quantify the degree of exposure to respiratory irritants which was precluded by Plaintiff's lung disease.  However, the ME's phraseology suggests that he did not believe that Plaintiff required an unusually stringent limitation in this respect:

> The medical issues are the problem, which appears to be occupationally caused or aggravated, obstructive lung disease with a [INAUDIBLE] component.  Spirometry and pulmonary function testing have shown low normal to mildly abnormal obstruction.  He has required institution of a bronchodilator regimen and is under the care of a specialty level physician.  He has on several occasions required prednisone, but no hospitalization or emergency room visits for the condition.  Based on the information I have, his condition would limit him to probably light exertional activity **with the usual respiratory restrictions: exposures to dust, respiratory irritants, extremes of environmental temperature on an indefinite and probably permanent basis** ....

(R. at 155)(bold added).

[7] After summarizing at length Plaintiff's testimony, (R. at 17), the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. at 18)

[8] Twice during the hearing, Plaintiff seemingly attributed his difficulty walking to a problem with his right leg rather than to a breathing problem.  This occurred first during questioning by the ALJ:

Q    Now, Dr. Gil[]man on numerous occasions suggested that you consider getting into some kind of retraining.  Have you done anything along those lines?

A    No.

161)  For example, on November 15, 2005, Ronald M. Gilman, M.D. ("Dr. Gilman"), recorded that Plaintiff's "symptoms have been improving since summer has ended.  He is able to walk around without great difficulty at the present time except that he

---

Q    Why not?

A    Because I can't -- I get very tired very quick doing stuff.  He told -- Dr. Gil[]man has told me to do some exercise to walk a little bit.  I walk so far, but I can only walk so far because my right leg gives out on me after walking so far.  I have to stop.

Q    What's wrong with your right leg?

A    I don't know.  It just gives out[].  I can stand up in the middle of the night, and my leg just gives out on me.  I don't know if it's a nerve problem.

Q    So how far can you walk before you have difficulty, not from your right leg, but from your breathing difficulty?

A    Probably a couple of blocks.

(R. at 161)  During questioning by his attorney, Plaintiff again cited a problem with his leg (and not his breathing) until prompted:

Q    Okay.  Are there -- you mentioned that you can walk a couple blocks and then you become short of breath.  Is that correct?

A    Yeah.  My leg gives out.

Q    Is it your leg or your breathing then?

A    My breathing.  I get tired.

(R. at 172)

When the ALJ asked Plaintiff what type of activities increased his respiratory distress, Plaintiff responded that he did not "do too many activities."  (R. at 167)  Plaintiff's inability to identify any particular activity which increased his respiratory problems casts further doubt on the extent to which this condition was as limiting as Plaintiff claimed.

somehow hurt his right leg and would like to see an orthopedist and will be going to the Orthopedic Group." (R. at 134) Six months later, on April 10, 2006, Plaintiff told Dr. Gilman that he felt "fairly well." (R. at 135) Dr. Gilman advised him "to increase his walking and activity gradually and to consider retraining." (Id.) A July 20, 2006, progress note made by Nurse Practitioner Karen Jutras reflects that Plaintiff's "breathing has been stabilized. He has not experienced any further exacerbations. He continues to work with Workers' Compensation. He is walking for exercise." (R. at 137) Finally, a February 7, 2007, medical report from Coastal Medical indicates that Plaintiff performed "5 laps," (R. at 140), during his visit while maintaining a steady blood oxygenation level, (id.).

In addition, Plaintiff testified that he was able to go to his child's medical appointments, (R. at 159), to the market, (R. at 160), and to Boston on the train, (id.). He also told Ronald Mark Stewart, M.D. ("Dr. Stewart"), that he picked his wife up at work. (R. at 75) These trips doubtless involved exposure to some levels of pulmonary irritants. Thus, there was additional evidence in the record from which the ALJ could have reasonably concluded that only concentrated exposure to such irritants was precluded, and this conclusion was supported by the opinions of Dr. Callaghan and Dr. Tonelli.

Before ending this discussion, it bears noting that the VE's response to the ALJ's questions strongly suggests that the VE understood the question to preclude exposure to any irritants:

> Q    First hypothetical. Assume an individual the
>      Claimant's age, education, and vocational back-
>      ground capable of performing at the medium exert-
>      ional level with no concentrated exposure to pul-
>      monary irritants including such things as dust,
>      fumes, smoke, but that's not an all-inclusive
>      list. Any pulmonary irritants, concentrated
>      exposure to extremes of cold or heat, and no
>      exposure to unprotected heights and dangerous

equipment.  That would preclude the past work?

A    Yes, Your Honor.

Q    Would it allow for other jobs?

A    Yes it would.  You know, the -- **any environment is going to have some irritants and pollutants in it.[9]  So, on a relative basis is that obviously if you can work in an air-conditioned environment, which is relatively clean, that would be the most consistent and most appropriate.**  Examples at that exertional level would be a wide range of maintenance type positions both at the light and the medium exertional levels in hospitals, nursing homes, buildings, you know, that type of thing.  Other examples would be working in like in cafeteria settings, you know, like someone who is a cafeteria attendant, you know, even a bus person who just, you know, picks up dishes and whatever and brings them to the kitchen, laundry folders where you're not actually working in a laundry room, packers in relatively clean factory settings.  These would be the type of jobs that would be most appropriate. Even at the sedentary level there are factories where you're doing bench work type of jobs where **you're actually not around or working with any, you know, direct pollutants,** and you're doing bench work type of jobs such as, you know, a bench hand or a stringer, a clasp fastener, even some things like a bench assembler.  The[y] would be the type of jobs that would be most appropriate.  These are examples, you know, at the sedentary, the light, the medium exertional levels. They're not all inclusive.  As I said, the primary limitation is the environmental -- environment you're working in that even with this factor particularly because of a high incidence in the number of jobs you're going to find that various

---

[9] To the extent that Plaintiff may contend that this statement demonstrates that there are no jobs available for a hypothetical claimant who must avoid all exposure to pulmonary irritants, the Court rejects such contention.  Rather, the VE's statement is reasonably understood to mean that there are some pulmonary irritants, e.g., dust, present in virtually all environments.

> maintenance type of positions in Rhode Island,
> Massachusetts, and Connecticut, you know, that as
> an aggregate you're going to be talking at least
> into the tens of thousands of jobs.  They are going
> to increase proportionally as one goes to national
> levels.  These are the type of jobs that are found
> in all geographical areas and not just here.  So
> they would increase proportionally as one goes on
> to national levels.

(R. at 176-77)(bold added).

The VE's initial observation — "[A]ny environment is going
to have some irritants and pollutants in it.  So, on a relative
basis is that obviously if you can work in an air-conditioned
environment, which is relatively clean, that would be the most
consistent and most appropriate," (R. at 176) — makes no sense
unless he understood the question as excluding exposure to all
pulmonary irritants.  Later in the course of his answer, the VE
referred to jobs which did not involve exposure to "any, you
know, direct pollutants ...."  (R. at 177)  Thereafter, in a
colloquy with the ALJ, the VE indicated that the hypothetical
claimant would be able to perform additional jobs "so long as
they're not impacted by the pollutants."  (R. at 179)
Immediately thereafter, the VE observed that "oftentimes when
you're dealing around machinery and factory settings there are
going to be pollutants that might not be consistent with the
hypothesis."  (Id.)  Such answers–in which the VE once used the
word "any," (R. at 177), but never used the qualifier
"concentrated," strongly suggest that the VE understood the ALJ's
question to encompass "any" rather than "concentrated"
pollutants.

For the reasons stated above, the VE's testimony constitutes
substantial evidence that a significant number of jobs exist in
the regional and national economy which Plaintiff is capable of
performing.  Plaintiff's claim that the ALJ erred in finding
Plaintiff limited with regarded to "concentrated exposure" to

14

pulmonary irritants as opposed to any exposure is, therefore, rejected.

## II. Substantial evidence supports the ALJ's finding that Plaintiff's depression was not a severe mental impairment.

In finding that Plaintiff's depression was not a severe impairment, the ALJ discussed the limited evidence which supported this claim and her assessment of it:

> Besides asthma, the claimant has also been treated, albeit briefly, for symptoms of depression. In March 2004[,] the claimant sought treatment at West Bay Psychiatric Associates for complaints of poor sleep, irritability, loss of interest, social isolation, and poor concentration. He was diagnosed with depression and started on Zoloft, an antidepressant. He returned after a week of complaining of adverse side effects from the medication and was given a trial of Paxil instead. At this time the claimant's global functioning was rated with a score of 62, which is consistent with "some mild symptoms" or "some difficulty in social, occupational, or school functioning."[10] The record indicates, however, that the claimant did not remain in treatment thereafter.
>
> In February 2005, by arrangement with his attorney representative, the claimant underwent a psychiatric evaluation with Ronald M. Stewart, M.D., and in February 2007 he underwent an evaluation with James K. Sullivan, M.D. ["Dr. Sullivan"]. Both doctors concluded that the claimant was totally disabled by reason of major depression. Their evaluations cite the claimant's depressed mood, sleep problems, feelings of worthlessness, social withdrawal, and poor concentration, and offer the opinion that because of his psychiatric condition the claimant would be unable to function adequately in the workplace [R. at 75-78, 141-46]. However, the undersigned finds that these evaluations are unpersuasive. They were arranged by the claimant's attorney representative and paid for by the claimant. They were clearly obtained for the purpose of enhancing the claimant's disability case. Therefore their

---

[10] In a footnote at this point in the decision, the ALJ cited to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR").

> objectivity is highly questionable.  Of note, if the
> claimant were as limited as the evaluations state, he
> would likely not have dropped out of psychiatric
> treatment after only two meetings.
>
> The claimant has no prior history of psychiatric
> treatment and has never had a psychiatric
> hospitalization.  Although he experienced a difficult
> change in circumstances when he had to give up his job as
> a paint technician after many years, his reaction to this
> change must be distinguished from serious, long-term
> mental illness.  The fact that he abandoned psychiatric
> treatment after two sessions would certainly be
> consistent with this view.  Overall, the undersigned
> finds no persuasive evidence that the claimant's mental
> impairment would significantly limit his ability to
> perform work-related activities.  Accordingly, it is
> determined to be a "non-severe" impairment.

(R. at 15)

Plaintiff challenges the ALJ's "non-severe" finding on three
grounds.  First, he argues that the ALJ failed to employ the
special technique for evaluating mental impairments.  See 20
C.F.R. § 404.1520a(c)(3); see also Figueroa-Rodriguez v. Sec'y of
Health & Human Servs., 845 F.2d 370, 372 (1st Cir. 1988)
(describing procedure).  Second, Plaintiff asserts that the ALJ
failed to provide any reasons for her rejection of the opinions
of the state agency physicians.  Third, Plaintiff challenges the
ALJ's rejection of the opinion of Dr. Stewart and Dr. Sullivan.

Before addressing these arguments, it bears reiterating that
the record does not contain significant psychiatric evidence.
The little evidence which there is was generated or procured by
attorneys representing Plaintiff.  (R. at 71, 75, 141)
Significantly, none of Plaintiff's treating physicians expressed
any opinion or belief that he had a mental impairment.  None of
them suggested that he seek treatment for such an impairment or
referred him to another medical provider for that purpose.  To
the contrary, as the ALJ pointed out, (R. at 18), Dr. Gilman

16

repeatedly recommended that Plaintiff get retrained and get back in the workforce, (R. at 115, 120, 126, 134, 135).

The only evidence of any mental health treatment consists of four pages from West Bay Psychiatric Associates where Plaintiff was seen on March 30 and April 6, 2004.  (R. at 71, 74)  The note from the first visit reflects that Plaintiff "was referred by his lawyer, Mr. Steven Dennis."[11]  (R. at 71)  Plaintiff had a global assessment of functioning ("GAF") of 62, (R. at 72), and a provisional diagnosis of major depressive disorder, recurrent, moderate, was made,[12] (id.).  He was started on Zoloft, but within a week Plaintiff discontinued this medication, stating that it made his eyes run and blurred his vision.  (R. at 74)  Plaintiff was prescribed a trial of Paxil, but did not return for further appointments, (id.), and did not continue with this medication, (R. at 159).  When asked by the ALJ why he had discontinued the medication, Plaintiff responded: "Because I would get depressed on them."  (R. at 159)

Plaintiff never sought any further treatment for his claimed depression.  In contrast, during the same period he continued to see doctors and other medical practitioners for his respiratory problems, visiting Dr. Gilman on June 7, 2005, November 15, 2005, and April 10, 2006, (R. at 118, 134, 135), and Nurse Practitioner Jutras on July 20, 2006, and February 7, 2007, (R. at 137, 139).  Although Plaintiff testified that between 2003 and 2006 his medical insurance status was "[o]ff and on," (R. at 157), the fact that he was able to obtain treatment for his respiratory

---

[11] It can be inferred that Attorney Dennis represented Plaintiff in his claim for workers' compensation because the same note indicates that Plaintiff "has been 'battling' workmen's comp since Dec '03 ...." (R. at 71)

[12] The provisional diagnosis was expressed numerically.  See DSM-IV-TR at 860 ("296.32  Major Depressive Disorder, Recurrent, Moderate").

problem undermines any contention that a lack of financial
resources prevented him from obtaining treatment for his alleged
depression.  The Court agrees with the Commissioner's observation
that "it is unsurprising that the ALJ concluded that Plaintiff
sought treatment for a legitimate, severe impairment, but not for
an inflated, non-severe condition."  Defendant's Memorandum of
Law in Support of Motion for an Order Affirming the Decision of
the Commissioner at 21.

Turning now to Plaintiff's three arguments, it is true that
the ALJ neglected to discuss each aspect of the process for
evaluating mental impairments as set forth in 20 C.F.R. §
404.1520a.  Application of the special technique requires that an
ALJ consider four broad subject areas when determining a
claimant's functional limitations: (1) "[a]ctivities of daily
living," 2) "social functioning," 3) "concentration, persistence
and pace," and 4) "episodes of decompensation."  20 C.F.R. §
404.1520a (2008).  Here the ALJ's omission must be considered in
context.

The ALJ recounted at length Plaintiff's hearing testimony
which encompassed his activities of daily living, social
functioning, and concentration, persistence, and pace.  (R. at
17)  Although the ALJ did not mention episodes of decompensation,
there is no evidence that Plaintiff ever experienced such an
episode.[13]  The ALJ detailed Plaintiff's claims regarding his
alleged mental impairment: that he was unable to work because he
could not concentrate; that he stayed inside the house; that he
was always depressed; that he drove very little because of poor
concentration; that he had difficulty sitting still because of
his nerves; that he slept poorly at night and took naps during

---

[13] J. Stephen Clifford, Ph.D.'s ("Dr. Clifford"), checkmark
indicating that Plaintiff experienced "One or Two," (R at 89) episodes
of decompensation of extended duration lacks any factual basis.

18

the day; that he watched television but had trouble
concentrating; that he felt depressed during the day and did not
feel like getting up in the morning; that he forgot things such
as doctors' appointments; that he had lost interest in things;
that he had few friends; that he had not gone out since
Christmas; that he did not care to be around people; that he
seldom cried and tended to hold things in; that he did not always
finish things he started; that he spent his time lying down,
walking outside, and taking naps; that his relationship with his
family had suffered because of his illness; that he used to take
his children out and help them with their homework, but now he
was very irritable; and that some days he did not get dressed or
leave the house.  (R. at 17)

It is plain to the Court that the ALJ declined to credit
these claims.  (R. at 15, 18)  The ALJ's credibility finding is
generally entitled to deference.  <u>Frustaglia v. Sec'y of Health &
Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987)("The credibility
determination by the ALJ, who observed the claimant, evaluated
his demeanor, and considered how that testimony fit in with the
rest of the evidence, is entitled to deference, especially when
supported by specific findings.")(citing <u>DaRosa v. Sec'y of
Health & Human Servs.</u>, 803 F.2d 24, 26 (1st Cir. 1986)); <u>see also
Yongo v. INS</u>, 355 F.3d 27, 32 (1st Cir. 2004)("[T]he ALJ, like
any fact-finder who hears the witnesses, gets a lot of deference
on credibility judgments."); <u>Suarez v. Sec'y of Health & Human
Servs.</u>, 740 F.2d 1 (1st Cir. 1984)(stating that ALJ is "empowered
to make credibility determinations ...").

Having resolved the issue of credibility adversely to
Plaintiff, engaging in a discussion of how his symptoms
correlated with various functional limitations would have been
pointless.  The Court declines to recommend remand for the
purpose of having the ALJ recount this same testimony in the

course of applying the special technique—only to state at the end
of that discussion that she finds no functional limitation in any
area because she rejects Plaintiff's testimony regarding his
limitations.  See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir.
1989)("No principle of administrative law or common sense
requires us to remand a case in quest of a perfect opinion unless
there is reason to believe that the remand might lead to a
different result."); accord Dantran, Inc. v. U.S. Dep't of Labor,
171 F.3d 58, 73 (1st Cir. 1999)(noting that when reviewing court
discovers serious infirmity in agency decisionmaking normal
course is to remand, but that "such a course is not essential if
remand will amount to no more than an empty exercise").  It would
be similarly without purpose to require the ALJ to again discuss
the opinions of Drs. Stewart and Sullivan, (R. at 15), merely to
demonstrate application of the special technique when those
opinions were totally dependant upon Plaintiff's self-report of
symptoms which the ALJ declined to credit.  The same is true with
respect to the opinions of the state agency physicians.
Accordingly, while it would have been preferable for the ALJ to
have referenced the special technique and made explicit findings
regarding the four functional areas, given the minimal evidence
of mental health treatment and the problems with Plaintiff's
credibility which are apparent even on a cold record, (R. at 156-
67), the Court declines to find that the ALJ's error requires
remand.

     With respect to Plaintiff's second argument, he is mistaken
in his assertion that the ALJ did not provide any reasons for her
rejection of the opinions of the state agency physicians.  The
ALJ stated that "[w]ith respect to the findings of the state
agency psychological consultant, who found the claimant's mental
impairment to be 'severe,' the undersigned finds that the longer
period of time covered by the current record demonstrates

persuasively that the claimant, who went without treatment throughout the period, was less significantly limited than had earlier been found."[14]   (R. at 19)   The record supports the ALJ's finding.   The state agency consultants reviewed the record in May and September of 2005.   (R. at 79, 99)   During the year and a half which followed, Plaintiff sought no psychiatric treatment even though he sought treatment for his asthma.   The lack of any evidence of sustained treatment may properly be considered by an ALJ.   See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991); see also Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 4 (1987)(concluding that lack of psychiatric treatment supported ALJ's finding that nervous condition was not severe).

Regarding Plaintiff's final argument, Plaintiff notes that the First Circuit has observed it is "quite common" for an attorney to obtain a medical opinion and that this is not a sufficiently substantive reason to discount the expert's report. See Plaintiff's Mem. at 11-12 (citing Gonzalez Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749 (1st Cir. 1987)). Plaintiff overlooks the fact that the ALJ gave additional reasons for discounting the two reports beyond the simple fact that they were procured by counsel.   The ALJ stated that if Plaintiff were as limited as the evaluations stated, he "would likely not have dropped out of psychiatric treatment after only two meetings." (R. at 15)   The ALJ also found the opinions of these two doctors unpersuasive because they were not consistent with the overall record.   Substantial evidence supports both of these reasons

---

[14] It is true that the ALJ refers to "state agency psychological consultant," (R. at 19), in the singular and there were two state agency consultants, Dr. Clifford and Mary Ann Paxson, Ph.D. ("Dr. Paxson").   However, the ALJ's reasoning is applicable to both opinions, and the Court declines to recommend remand to have the ALJ state what can reasonably be inferred.

given by the ALJ.

Plaintiff complains that the ALJ failed to consider that the opinions were consistent with each other and consistent with Plaintiff's testimony. <u>See</u> Plaintiff's Mem. at 12. However, it is clear that the ALJ was aware that both doctors "found that the claimant had moderately severe limitations in the ability to meet the demands of the workplace ...." (R. at 18) The ALJ was also doubtless aware that Plaintiff's testimony was consistent with their opinions as the ALJ recounted that testimony in detail, (R. at 17), but did not find it entirely credible, (R. at 18). In short, the Court finds Plaintiff's third argument unpersuasive.

## Conclusion

The Court finds that the ALJ's determination that Plaintiff was not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and that any legal error is harmless. I therefore recommend that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to Reverse be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
June 15, 2009